*Matthew Skipper, et al. v. CareFirst BlueChoice, Inc.*, No. 2479, September Term, 2023.
Opinion by Hotten, J.

**PRE-JUDGMENT INTEREST – EFFECT OF DEFENDANT'S PRE-TRIAL TENDER OF COMPENSATORY RELIEF**

A defendant's tender of compensatory monetary relief to a plaintiff following the filing of a complaint does not automatically render moot whatever claim the plaintiff may have for pre-judgment interest.

**CIVIL PROCEDURE – CLASS ACTIONS – CERTIFICATION OF CLASS ACTION – MOOTNESS**

In an action filed as a class action, the defendant's tender of individual damages to the prospective class representative shortly after a complaint was filed does not require denial of certification of the case as a class action on the ground that the prospective class representative's individual claim has been rendered moot. Tender of individual relief to the putative class representative does not moot a class action if that plaintiff has not been afforded a reasonable opportunity to seek class certification, including any necessary discovery.

Circuit Court for Prince George's County
Case No.: C-16-CV-23-001420

REPORTED

IN THE APPELLATE COURT

OF MARYLAND

No. 2479

September Term, 2023

_____

MATTHEW SKIPPER, *ET AL.*

v.

CAREFIRST BLUECHOICE, INC.
_____

Nazarian,
Leahy,
Hotten, Michele D.
    (Senior Judge, Specially Assigned),

JJ.
_____

Opinion by Hotten, J.
_____

Filed: March 3, 2025

*Tang, Rosalyn, J., and Albright, Anne, J., did not participate in the Court's decision to designate this opinion for publication pursuant to Md. Rule 8-605.1.

Pursuant to the Maryland Uniform Electronic Legal Materials Act (§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Gregory Hilton, Clerk

Appellants, Matthew and Jamie Skipper, appeal the grant by the Circuit Court for Prince George's County of a motion to dismiss in favor of appellee, CareFirst BlueChoice, Inc. The Skippers present three questions for this Court's review,[1] which we have consolidated and rephrased, as follows:

1. Where the principal amount of an insurance claim is paid years after the date it was due, but before the date a judgment issues, is the delay in payment a sufficient injury, on its own, to support standing?

For the reasons that follow, we reverse the circuit court's grant of the motion to dismiss and remand for further proceedings consistent with this opinion.[2]

## BACKGROUND

The Skippers are a married couple residing in Bowie, Maryland. In 2010, following a diagnosis of female infertility, the Skippers sought fertility treatment from the GW Medical Faculty Associates Fertility & IVF Center ("GW-MFA"). At the time, they had a health insurance policy through Aetna.

From 2012 to 2015, the Skippers made several attempts at intrauterine insemination, followed by several egg retrieval cycles and several attempted fresh embryo transfers. These initial retrieval and fresh transfer cycles were all unsuccessful, but were covered under the Skippers' Aetna policy. In 2015, the Skippers' physician determined that

---

[1] The Skippers presented the following questions on appeal:
1. Does loss of use of funds constitute an injury for purposes of standing?
2. Is an unpaid principal necessary for pre-judgment interest?
3. Does late payment of an insurance reimbursement constitute complete relief for failure to cover the service at the outset?

[2] Since we reverse the grant of the motion to dismiss, the circuit court's subsequent denial of the Skippers' motion to alter or amend the judgment is rendered moot.

pregnancy was extremely unlikely to result from a fresh embryo transfer and advised that the Skippers should create and freeze embryos for transfer.[3]

At some point in 2016, the Skippers switched their coverage from Aetna and obtained a new health insurance policy with CareFirst. However, there was a period in between coverage under the two policies where the Skippers were uninsured.[4] During the period between the end of their coverage through Aetna and before their coverage through CareFirst, the Skippers created and froze four embryos from a fresh egg retrieval. Soon thereafter, the Skippers transferred two of the frozen embryos, resulting in a successful pregnancy. Since these procedures occurred at a time when the Skippers were uninsured, they were paid for out of pocket by the Skippers.

Mr. Skipper, as the subscriber and primary insured, entered into an Individual Enrollment Agreement ("IEA") with CareFirst, effective January 1, 2018. Ms. Skipper was also covered under the policy as a dependent spouse. The IEA provides for coverage of

---

[3] Egg freezing, also known as oocyte cryopreservation, is a process in which a woman's eggs (oocytes) are extracted, frozen, and stored to preserve reproductive potential in women of reproductive age. *What is Egg Freezing?*, UCLA Health, https://www.uclahealth.org/medical-services/obgyn/fertility/egg-freezing. Women choose to undergo egg freezing for a variety of reasons, such as waiting to find the right partner or because of a medical treatment or health condition that can affect fertility. The total cost of the process generally covers medication, ultrasounds, bloodwork, the egg retrieval procedure, the egg freezing process, and annual frozen egg storage fees. Whether any of the treatment is covered by insurance varies depending on the insurance plan. Pardis Hosseinzadeh, M.D., M.S.C., *Freezing Eggs: Preserving Fertility for the Future*, Johns Hopkins Medicine, https://www.hopkinsmedicine.org/health/wellness-and-prevention/freezing-eggs-preserving-fertility-for-the-future.

[4] It is not clear from the record why or when exactly the Skippers switched their health insurance coverage from Aetna, nor is it clear how long the Skippers were uninsured before coverage under their CareFirst policy became effective. However, it is clear that the Skippers were insured by CareFirst during the events at issue in the case at bar.

"Medically Necessary, non-Experimental/Investigational artificial insemination, intrauterine insemination and in-vitro fertilization." The IEA goes on to state that benefits are limited to "Assisted reproductive technologies as described and limited below," with one of those limitations being for "Ovum transplants and gamete intra-fallopian tube transfer, zygote intra-fallopian transfer, or cryogenic or other preservation techniques used in these or similar procedures."

On July 2, 2018, the Skippers' physician contacted CareFirst to request coverage for IVF treatment using the remaining frozen embryos. The next day, CareFirst denied coverage for the embryo thawing, reasoning that it was "not a covered benefit/service," but otherwise approved coverage for the embryo transfer. The Skippers received this prior authorization from CareFirst on September 7, 2018. Despite the denial of coverage, the Skippers proceeded with the IVF process, jointly paying $900 of their marital funds out of pocket to cover the cost of embryo thawing on October 2, 2018.

Nearly two years later, the Skippers appealed CareFirst's denial of coverage in a letter dated June 12, 2020. CareFirst denied the appeal in a letter dated July 9, 2020, explaining that an appeal must be submitted within 180 days of the adverse benefit determination. Since the Skippers' appeal was received on June 16, 2020, more than 180 days after the July 2, 2018 denial, CareFirst determined that it could not consider the untimely appeal.

On November 9, 2020, the Skippers filed a complaint with the Maryland Insurance Administration ("MIA"), alleging lack of good faith and breach of contract and seeking a declaratory judgment against CareFirst. CareFirst responded on December 4, 2020. While

the administrative action was pending, the Skippers also filed a putative class action lawsuit against CareFirst on April 27, 2021, in the United States District Court for the District of Maryland. At some point during this time, CareFirst chose to pay the $900 embryo thawing charge directly to the IVF provider rather than incur the larger expense of continued MIA proceedings. On May 20, 2021, CareFirst issued a new Explanation of Benefits ("EOB"), confirming payment of the $900 embryo thawing charge to the Skippers' physician. Citing CareFirst's $900 payment to the Skippers' health care provider, the MIA informed the Skippers that it was closing their file in a letter dated June 2, 2021.[5]

Despite CareFirst's $900 payment to their health care provider and the closing of their MIA complaint, the Skippers continued to pursue relief in federal court. However, on March 8, 2023, the United States District Court for the District of Maryland dismissed the Skippers' complaint, without prejudice, for lack of federal subject matter jurisdiction.

The Skippers timely filed the instant action in the Circuit Court for Prince George's County on March 24, 2023, alleging both breach of contract and negligent misrepresentation.[6] In addition to monetary damages, the Skippers also sought a

---

[5] The MIA noted that, since the Skippers' health care provider is a "participating provider," CareFirst "reminded them they must reimburse the insureds." However, there is no evidence or indication from the record whether the provider ever reimbursed the Skippers for their out-of-pocket expense. This remains an open factual question. Our analysis does not hinge on the answer to that question, however, so we proceed from the premise that the Skippers did receive the reimbursement. If the provider did in fact fail to reimburse the Skippers, their injury would only be bolstered.

[6] The Skippers' complaint was timely under Maryland Rule 2-101(b), which requires an action be treated as timely filed if it is filed in a circuit court within 30 days after dismissal by a United States District Court or a court of another state for lack of jurisdiction.

declaratory judgment that embryo thawing is a necessary component of IVF and must be covered where CareFirst otherwise provides coverage for IVF.

CareFirst moved to dismiss the complaint on May 25, 2023. In its Motion to Dismiss, CareFirst argued that both Skippers lack standing to bring this lawsuit. CareFirst argued that Ms. Skipper lacks standing because her claim is moot, reasoning that "[w]hile her claim was pending at the MIA, CareFirst reissued the applicable EOB, making payment of the disputed payment to GW-MFA for embryo thawing." Additionally, CareFirst argued that Mr. Skipper lacks standing because "[t]he $900 charge was incurred by Ms. Skipper alone." In addition to their standing arguments, CareFirst also contended that the Skippers' complaint failed to state a claim for breach of contract, negligent misrepresentation, or for declaratory relief.

On November 16, 2023, the circuit court granted the motion to dismiss for lack of standing. In a one-page-opinion, the circuit court reasoned that the "Skippers' claim that CareFirst's reimbursement did not account for interest or inflation is considered a claim for pre-interest judgment. The Skippers thus cannot use the temporary loss of that payment as a basis for damages." The Skippers moved to alter or amend the judgment on November 27, 2023, which the court summarily denied on February 6, 2024.

The Skippers timely filed a notice of appeal on February 28, 2024.

## STANDARD OF REVIEW

"[W]here a motion [to alter or amend a judgment] is filed within ten days [after the judgment's entry], an appeal will not ordinarily lie until the trial judge rules on the motion." *Nina & Nareg, Inc. v. Movahed*, 369 Md. 187, 199 (2002). The Skippers filed a timely

motion to alter or amend within ten days of the judgment dismissing their complaint. *See* Md. Rule 2-534. Then, they filed a timely notice of appeal within thirty days after the circuit court denied their motion to alter or amend the judgment. *See* Md. Rule 8-202(c). In this instance, the Skippers' notice of appeal "was necessarily from the judgment dismissing" their complaint. *Green v. Hutchinson*, 158 Md. App. 168, 171 (2004).

We review de novo the grant of a motion to dismiss. *D.L. v. Sheppard Pratt Health Sys., Inc.*, 465 Md. 339, 350 (2019). In considering whether a motion to dismiss was properly granted, we must "assume the truth of, and view in a light most favorable to the nonmoving party, all well-pleaded facts and allegations contained in the complaint, as well as all inferences that may reasonably be drawn from them[.]" *Reiner v. Ehrlich*, 212 Md. App. 142, 151 (2013) (quoting *Gomez v. Jackson Hewitt, Inc.*, 427 Md. 128, 142 (2012)). Dismissal is proper "only if the allegations and permissible inferences, if true, would not afford relief to the plaintiff, *i.e.*, the allegations do not state a cause of action for which relief may be granted." *Id.*

**DISCUSSION**

I.      **Maryland's Standing Jurisprudence**

The circuit court's ruling on the motion to dismiss appeared to rest on the Skippers' standing to sue. Specifically, the circuit court dismissed the Skippers' complaint because it found that a temporary loss of payment was not a sufficient injury to confer standing.

Standing is a "threshold issue," *Norman v. Borison*, 192 Md. App. 405, 420 (2010), that must be met for a litigant to "invoke the judicial process in a particular instance." *Adams v. Manown*, 328 Md. 463, 480 (1992). In Maryland, "standing to bring a judicial

6

action generally depends on whether one is aggrieved, which means whether a plaintiff has an interest such that he or she is personally and specifically affected in a way different from the public generally." *Pizza di Joey, LLC v. Mayor of Balt.*, 470 Md. 308, 343 (2020). Such an interest could be, but is not limited to, "one of property, one arising out of a contract, one protected against tortious invasion, or one founded on a statute which confers a privilege." *Comm. for Responsible Dev. on 25th St. v. Mayor & City Council*, 137 Md. App. 60, 72 (2001) (quoting *Balt. Steam Co. v. Balt. Gas & Elec. Co.*, 123 Md. App. 1, 15 (1998)).

The purpose of the standing inquiry is to "ensure that a party seeking relief has a sufficiently cognizable stake in the outcome so as to present a court with a dispute that is capable of judicial resolution." *Kendall v. Howard Cnty.*, 431 Md. 590, 603 (2013) (quoting *Hand v. Mfrs. & Traders Tr. Co.*, 405 Md. 375, 399 (2008)). However, standing is merely "an element of the larger question of justiciability." *Id.* Even where one has an interest in the outcome of a case, that interest may become moot.

A case becomes moot "when there is no longer an existing controversy when the case comes before the Court or when there is no longer an effective remedy the Court could grant." *In re R.S.*, 242 Md. App. 338, 353 (2019) (quoting *Suter v. Stuckey*, 402 Md. 211, 219 (2007)). One way that a case can be rendered moot is via a tender of relief. "Courts generally decide whether a matter is moot as a result of a tender of relief by examining whether the tender encompasses *all* of the relief to which a party may be entitled." *Frazier v. Castle Ford, Ltd.*, 430 Md. 144, 163 (2013). Absent complete relief, a case or controversy remains to be adjudicated.

## II.     The Parties' Contentions

The Skippers argue that their claims are not moot, and that by extension they retain standing to bring this lawsuit, because the alleged $900 reimbursement by CareFirst did not afford them complete relief. Even assuming CareFirst properly reimbursed them for their out-of-pocket expenditure, thereby remedying the initial breach, the Skippers contend that such reimbursement failed to compensate them for their loss of use of the $900 for a period of approximately three years. According to the Skippers, loss of use of funds for a period of time is a separate and distinct injury, with pre-judgment interest as the mechanism for compensating that injury. Therefore, they argue, a straight "dollar-for-dollar refund" does not render their claims moot.

The Skippers advance two additional arguments for standing in their briefs. First, they argue that even if the $900 payment did provide complete relief, that payment could not automatically moot their class claims because it was an attempt to "pick off" the named plaintiffs prior to an opportunity to move for class certification. Second, the Skippers argue that they retain standing to pursue injunctive or declaratory relief because CareFirst's payment did not address or satisfy that relief.

CareFirst, on the other hand, argues that the Skippers "cannot have a claim for breach of contract or negligent misrepresentation without proving damages." CareFirst contends that the Skippers "never adequately plead *any* damages, nor any basis to recover prejudgment interest." Instead, according to CareFirst, the Skippers' complaint alleges only "generalized allegations of the loss of use of funds," which CareFirst argues are insufficient to confer standing.

Responding to the Skippers' other arguments, CareFirst argues that the Skippers waived their "pay off any potential lead plaintiff" argument by failing to raise it below, and that even if they did not waive the argument, it should fail because the payment was not made with the intent of picking off potential lead plaintiffs in a putative class action. CareFirst also argues that the Skippers lack standing to seek injunctive or declaratory relief because no actual or imminent controversy exists with respect to the specific relief requested.

## III. Analysis

### A. The Skippers Adequately Pleaded Pre-judgment Interest as an Element of their Damages

By arguing that the Skippers failed to adequately plead damages, CareFirst misapprehends the compensatory function of pre-judgment interest. Pre-judgment interest is a remedy that "*compensates* judgment creditors for their inability to use the funds that should have been in their hands before the entry of judgment." *Bennett v. Ashcraft & Gerel, LLP*, 259 Md. App. 403, 461 (2023) (emphasis added). "[T]he 'purpose of awarding pre-judgment interest ... is to *compensate* the aggrieved party for the loss of the use of the principal liquidated sum found due it and the loss of income from such funds.'" *Nationwide Prop. & Cas. Ins. Co. v. Selective Way Ins. Co.*, 473 Md. 178, 189 (2021) (quoting *Harford Cnty. v. Saks Fifth Ave. Distrib. Co.*, 399 Md. 73, 95 (2007)) (cleaned up) (emphasis added).

CareFirst argues that the Skippers' claim for pre-judgment interest offers nothing more than generalized allegations regarding how they would have used the funds to which

9

they allege they were entitled. For example, CareFirst points to the Skippers' contention that they could have invested the lost funds for an even larger return, or simply used the money for a household expense that they had to divert other funds to cover, or forgo. These "generalizations" of deprivation of funds, CareFirst argues, are insufficient to confer standing, because they fail to offer evidence of specific losses.[7] However, whether courts should award pre-judgment interest "usually does not depend on what the debtor might have done with the money." *Buxton v. Buxton*, 363 Md. 634, 652 (2001). Therefore, the Skippers need not allege any specific uses for the money of which they were deprived. It is sufficient that the Skippers alleged a general loss of the use of funds for a period of years and requested pre-judgment interest as a remedy for that injury.

This Court's own precedents belie CareFirst's argument that the Skippers failed to adequately plead damages. We have explicitly recognized that "prejudgment interest is an element of the plaintiff's damages[.]" *Selective Way Ins. Co. v. Nationwide Prop. and Cas. Ins. Co.*, 242 Md. App. 688, 745 (2019), *aff'd*, 473 Md. 178 (2021) (quoting *Fraidin v. Weitzman*, 93 Md. App. 168, 219 (1992)). The concept of pre-judgment interest as a separate measure of damages is also reflected in Maryland Rule 2-604(a), which states that

---

[7] In support of its argument, CareFirst cites decisions from the United States District Court for the District of Columbia and the Tennessee Court of Appeals. *See Taylor v. FAA*, 351 F. Supp. 3d 97, 103 (D.D.C. 2018) (holding that generalized allegations of the loss of use of funds "are not the kind of clear allegations of fact necessary to establish an injury in fact, even at the motion to dismiss stage"); *Carson v. DaimlerChrysler Corp.*, 2003 WL 1618076, at *4 (Tenn. Ct. App. March 19, 2003) (unpublished) (holding that "the possibility of pre-judgment interest does not provide an independent cause of action," and that a "potential award of interest based only on a favorable judgment cannot save a cause of action that is otherwise moot"). In light of contrary Maryland precedent, these cases are not persuasive.

"[a]ny pre-judgment interest awarded by a jury or by a court sitting without a jury shall be *separately stated* in the verdict or decision and included in the judgment." Md. Rule 2-604(a) (emphasis added). Thus, pre-judgment interest as a measure of damages is in *addition* to any economic damages awarded for the initial breach.

### B. The Skippers Have Standing because CareFirst's $900 Payment did not Provide Complete Relief

Since the Skippers adequately pled pre-judgment interest as an element of their damages, the question becomes whether CareFirst's tender of relief, which did *not* include interest, rendered their claim moot. A tender of relief should result in dismissal only where "the tender encompasses *all* of the relief to which a party *may* be entitled." *Frazier*, 430 Md. at 163 (second emphasis added). Otherwise, a dispute remains over which the parties may litigate.

In *Frazier*, the Supreme Court of Maryland considered whether a pretrial tender of compensatory damages rendered a case moot when the plaintiff was also seeking punitive damages. *Id.* at 148. In that case, Frazier purchased an extended warranty for his vehicle from an automotive dealership, and at the time of the sale, was told that the extended warranty would last for 48 months from the date of purchase or 100,000 miles, whichever occurred first. *Id.* at 149. What Frazier did not know, however, was that the duration of the extended warranty was calculated from the "build date" of the automobile. *Id.* As a result, the warranty expired more than two years sooner than Frazier had expected, forcing him to incur out-of-pocket repair expenses that would have otherwise been covered by the warranty had it lasted for the promised four-year period. *Id.*

11

Frazier filed a complaint against the dealership seeking, among other remedies, compensatory and punitive damages. *Id.* at 150. After the filing of the complaint, the dealership extended Frazier's warranty to cover the entire four-year period following his purchase of the warranty, and he received a check for the amounts he had paid for the repairs during that period. *Id.*

The circuit court dismissed Frazier's complaint as moot, finding that Frazier had been made whole by the tender of relief, and that he had no further interest in the outcome of the litigation. *Id.* at 150-51. We affirmed that decision. *Id.* at 152. However, the Supreme Court of Maryland reversed, finding that "[w]hile it may be that the plaintiff's injury has been remedied, the plaintiff's claim has not necessarily been fully satisfied." *Id.* at 163. The Court reasoned that punitive damages serve a different purpose than compensatory damages, and therefore, "[w]here punitive damages are appropriately demanded, a pretrial tender of compensatory damages does not fully satisfy the claim and does not preclude an award of punitive damages." *Id.* Instead, the Court described such a tender as "merely an offer of settlement." *Id.*

Here, as in *Frazier*, the Skippers believed that certain services were covered under their contract with CareFirst. Upon discovering that those services were not covered, they paid for the services out-of-pocket. They later sued CareFirst in federal court, seeking actual damages and pre-judgment interest, among other remedies. Less than a month after the Skippers filed their federal complaint, CareFirst tendered $900 to GW-MFA, allegedly satisfying the Skippers' actual damages. However, the $900 payment did not include any interest accrued in the nearly three years since the payment was originally due, nor did it

12

address the Skippers' claims for injunctive or declaratory relief. Thus, as in *Frazier*, the Skippers' injury may have been remedied, but their "claim has not necessarily been fully satisfied." 430 Md. at 163.

### 1. Satisfaction of the Principal Debt Prior to Judgment Does Not Render Moot a Claim for Pre-judgment Interest

It does not matter that the principal debt had already been satisfied when the Skippers brought the instant action. While Maryland's appellate courts have not considered whether a plaintiff has standing to sue for pre-judgment interest in such a scenario, other jurisdictions have done so, and they have determined that plaintiffs retain standing to sue in such circumstances. *See, e.g.*, *Shatterproof Glass Corp. v. Libbey–Owens–Ford Co.*, 482 F.2d 317, 324 (6th Cir. 1973) (holding that tender of amount due did not obviate debtor's obligation to pay interest for delay in payment in action for breach of contract); *McKinney v. United States*, 75 F. Supp. 3d 266, 276 (D.D.C. 2014) ("[A] plaintiff may maintain an independent action for breach of contract based on a delay in payment."); *4Kids Entm't, Inc. v. Upper Deck Co.*, 797 F. Supp. 2d 236, 252 (S.D.N.Y. 2011) ("Paying the invoice in full satisfies Plaintiffs' claim for the principal amount, but does not excuse the failure to make *timely* payment. Plaintiffs are entitled to damages in the form of interest commencing thirty days after the invoice was issued."); *Ramsey v. United States*, 101 F. Supp. 353, 356 (Ct. Cl. 1951) ("The law implies an agreement to make good the loss arising from a default in payment of money at a specified time by requiring the payment of lawful interest.").

Our jurisprudence does not require that an injury be of a certain magnitude before it will confer standing. Rather, standing merely "depends on whether one is aggrieved[.]"

13

*Pizza di Joey, LLC*, 470 Md. at 343. Even if the Skippers were reimbursed for the full amount of their initial claim, they were still aggrieved by CareFirst's failure to make the payment for nearly three years, depriving the Skippers of funds to which they claim they were contractually entitled. Since CareFirst did not pay interest to compensate the Skippers for that loss of use, the Skippers retain a sufficiently cognizable stake in the outcome of this case.

### 2. A Well-Pleaded Claim for Pre-judgment Interest is Sufficient to Confer Standing Even Where there is no Entitlement to Pre-judgment Interest

Also irrelevant to the standing inquiry is the fact that the Skippers may not be entitled to pre-judgment interest. An analogy to the law of punitive damages is once again appropriate. "[A] plaintiff has no right or entitlement to punitive damages under Maryland law." *Darcars Motors of Silver Spring, Inc. v. Borzym*, 150 Md. App. 18, 66 (2003) (quoting *Bowden v. Caldor*, 350 Md. 4, 25 (1998)). Despite this, the Court in *Frazier* held that where a plaintiff appropriately demands punitive damages, they have standing to seek those damages even where their injury has already been remedied by a pretrial tender of compensatory damages. 430 Md. at 163.

Similar to punitive damages, plaintiffs are generally not entitled to pre-judgment interest. In fact, pre-judgment interest is not recoverable at all in most tort cases. *See Buxton*, 363 Md. at 656 ("[I]n tort cases where the recovery is for bodily harm, emotional distress, or similar intangible elements of damage not easily susceptible of precise measurement, the award itself is presumed to be comprehensive, and pre-judgment interest is not allowed."). In most contract cases, whether to award pre-judgment interest is a matter

14

of discretion reserved for the finder of fact. *Id.* (holding that there "is a broad category of contract cases in which the allowance of pre-judgment interest is within the discretion of the trier of fact").

"[P]re-judgment interest as a matter of right is the exception rather than the rule[.]" *Ver Brycke v. Ver Brycke*, 379 Md. 669, 702 (2004); *see also Buxton*, 363 Md. at 656 (quoting *First Va. Bank v. Settles*, 322 Md. 555, 564 (1991)) ("Pre-judgment interest is allowable as a matter of right when 'the obligation to pay and the amount due had become certain, definite, and liquidated by a specific date prior to judgment so that the effect of the debtor's withholding payment was to deprive the creditor of the use of a fixed amount as of a known date.'"). However, entitlement to pre-judgment interest as a matter of right is not a prerequisite for standing. As in *Frazier*, plaintiffs who appropriately demand pre-judgment interest in contract cases have standing to seek such interest, even where they are not entitled to it as a matter of right, because it is a recoverable element of damages.

### 3. Maryland Rule 2-604 Does not Bar Plaintiffs from Seeking Pre-judgment Interest on a Satisfied Judgment

In its order dismissing the Skippers' complaint, the circuit court cited Maryland Rule 2-604(a), which states, "Any pre-judgment interest awarded by a jury or by a court sitting without a jury shall be separately stated in the verdict or decision and included in the judgment." Md. Rule 2-604(a). The circuit court held, seemingly based on this provision, that "[t]he Skippers thus cannot use the temporary loss of that payment as a basis for damages." Furthermore, citing Maryland's Civil Pattern Jury Instructions, CareFirst argues that "Maryland juries are routinely instructed to consider an award of prejudgment

interest only after they have first determined that the plaintiff is entitled to recover damages for past economic losses." The implication of this argument is that, since the Skippers have already recovered $900 in economic damages from CareFirst, they no longer have any economic damages on which a jury could base an award of pre-judgment interest. However, this argument is flawed.

Rule 2-604(a) makes clear that pre-judgment interest is "included in the judgment." Md. Rule 2-604(a). Thus, even where the principal amount of a judgment has been paid before the judgment issues, a court can still issue the judgment, including economic damages for the principal amount owed and pre-judgment interest thereon, and simply deem the principal portion of the judgment already satisfied. To hold otherwise would permit debtors to deprive creditors of the use of funds for a period of time, and then avoid paying interest for that deprivation by simply paying off the principal amount due. Since "pre-judgment interest is in the nature of an element of damages" in contract cases, a pretrial payment of the principal amount owed, absent any interest, does not "make the plaintiff whole." *Maryland State Highway Admin. v. Kim*, 353 Md. 313, 327 (1999). Therefore, the Skippers retain standing to sue for pre-judgment interest.

### C. Even if the Tender of Compensatory Damages Provided Complete Relief, a Class Action Claim is Not Moot Until the Putative Class Representative has a Reasonable Opportunity to Seek Class Certification

Assuming, arguendo, that CareFirst's delayed payment of the $900 embryo thawing charge constitutes complete relief, the Skippers contend that the payment did not automatically moot their class claims because "[c]ourts in Maryland and elsewhere have resoundingly rejected efforts to pick off named plaintiffs prior to an opportunity to move

16

for class certification." CareFirst, on the other hand, argues that the Skippers waived this argument by failing to raise it below. Alternatively, CareFirst argues that (1) the $900 payment was not made in an effort to pay off the Skippers as proposed class representatives, because the payment was made in response to the MIA claim filed by the Skippers, and (2) CareFirst never argued in federal court that the Skippers' claims were moot as a result of the payment. We agree with the Skippers and hold that even if CareFirst tendered complete relief when it made the $900 payment, the circuit court still erred in dismissing the case without affording the Skippers a reasonable opportunity to seek class certification.

### 1. The Skippers Did Not Waive Their Argument Regarding Class Relief

CareFirst's argument for waiver is predicated on the fact that the Skippers did not raise their "pay off any potential lead plaintiff" argument in their Opposition to CareFirst's Motion to Dismiss. Instead, the Skippers raised this argument for the first time in their Rule 2-534 Motion to Alter or Amend Judgment. CareFirst argues that this constituted a waiver of that argument because Maryland Rule 2-311(c) states that "[a] written motion and a response to a motion shall state with particularity the grounds and the authorities in support of each ground." Md. Rule 2-311(c). The Skippers defend their failure to include this argument in their response to CareFirst's Motion to Dismiss. According to the Skippers, they wanted to raise this argument at the motion to dismiss stage, but were barred from doing so by the circuit court.

While an appellate court will not ordinarily decide an issue "unless it plainly appears by the record to have been raised in or decided by the trial court," Md. Rule 8-131(a), this Court "may exercise the discretion to review issues not raised in the proceedings below."

17

*State v. McGagh*, 472 Md. 168, 194 (2021). Here, although the Skippers did not raise their "pay off any potential lead plaintiff" argument in their Opposition to CareFirst's Motion to Dismiss, it is clear that they did not do so because the circuit court instructed them not to do so.[8] Thus, this Court will exercise its discretion to consider the Skippers' argument regarding class relief.

> **2. Where a Defendant Makes a Post-Complaint Tender of Full Individual Relief to a Putative Class Representative, Courts Must First Determine Whether the Named Plaintiff has had a Reasonable Opportunity to Seek Class Certification, Including any Necessary Discovery**

In support of their argument that CareFirst's $900 payment does not moot their class claims, even if it is considered complete relief, the Skippers again cite to the Supreme Court of Maryland's decision in *Frazier*. There, the Court assessed the consequences of a tender of individual relief in the class action context, and held that "a tender of individual relief to the putative class representative does not moot a class action if the individual plaintiff has not had a reasonable opportunity to seek class certification, including any necessary discovery." *Frazier*, 430 Md. at 161. Since in that case the circuit court "apparently believed that the tender of individual relief prior to class certification, by itself, mooted the class action," the Court remanded the case for reconsideration by the circuit court. *Id.*

Explaining its holding, the *Frazier* Court reasoned that "[i]f all a defendant need do to defeat a class action is to satisfy the class representative's claim immediately after suit

---

[8] In response to the Skippers' attempt to raise their argument regarding class relief, the trial judge stated, "I can't actually deal with any of the class issues because it's assigned to Judge Snoddy. It's not assigned to me."

18

is filed, many meritorious class actions will never get off the ground." *Id.* at 157. Additionally, while the Court did warn that "[i]t will be particularly tempting to 'pick off' a putative class representative in cases where the underlying conduct affected many people but each claim, including the class representative's, is small or moderate in size[,]" the Court did not require that plaintiffs prove an intent on the part of defendants to "pick them off." *Id.* at 158. Rather, plaintiffs need only show that they were not afforded a reasonable opportunity to seek class certification. *Id.* at 161.

Here, as in *Frazier*, CareFirst "made no effort to rectify the situation until the [federal] class action complaint was filed, but then immediately took action to moot it by tendering individual damages to the plaintiff shortly after the [federal] complaint was filed[.]" *Id.* at 157.[9] The Skippers had no "reasonable opportunity to seek class certification or to conduct discovery addressed to the merits of class certification" in the federal action since it was dismissed on jurisdictional grounds.[10] *Id.* Similarly, they had no such

---

[9] The Skippers filed their complaint with the MIA on November 9, 2020. CareFirst claims that its $900 payment was made in response to the MIA claim. However, CareFirst did not make the $900 payment until May 20, 2021, 192 days after the MIA complaint was filed. By contrast, the payment was made only 23 days after the Skippers filed their federal class action complaint on April 27, 2021. Given this timeline, it is more likely that CareFirst was motivated by the filing of the class action complaint when it made the $900 payment.

[10] CareFirst moved to dismiss the Skippers' federal complaint for, among other reasons, lack of jurisdiction under the Class Action Fairness Act, and the federal court granted the motion solely on that ground. *See Skipper v. CareFirst Bluechoice, Inc.*, No. CV DLB-21-1022, 2023 WL 2410858, at *1-4 (D. Md. Mar. 8, 2023). CareFirst conspicuously left out of its motion to dismiss the federal complaint any argument regarding the effect of the $900 payment on Ms. Skipper's standing. CareFirst now argues that its failure to make such an argument in federal court shows that it did not intend for
(continued)

19

opportunity in the circuit court either since that court dismissed their complaint on standing grounds. Thus, the circuit court failed to consider whether the Skippers "had an adequate opportunity to file a timely motion for class certification" before it dismissed their complaint. *Frazier*, 430 Md. at 161. On remand, the circuit court should determine whether to permit the Skippers to file such a motion. The Ninth Circuit's decision in *Pitts v. Terrible Herbst, Inc.*, 653 F.3d 1081 (9th Cir. 2011), whose reasoning was adopted by the *Frazier* Court, provides a helpful roadmap for the circuit court's next steps:

> If the named plaintiff can still file a timely motion for class certification, the named plaintiff may continue to represent the class until the district court decides the class certification issue. Then, if the district court certifies the class, ... the case may continue despite full satisfaction of the named plaintiff's individual claim because an offer of judgment to the named plaintiff fails to satisfy the demands of the class. Conversely, if the district court denies class certification, ... the plaintiff may still pursue a limited appeal of the class certification issue. Only once the denial of class certification is final does the defendant's offer—if still available—moot the

the payment to moot Ms. Skipper's claims. However, whether this is true or not, CareFirst *did* argue in its motion to dismiss the Skippers' state court action that the payment mooted Ms. Skipper's claims. Thus, before dismissing their complaint solely on the basis of the $900 payment, the circuit court should at the very least have determined whether the Skippers had a "reasonable opportunity to seek class certification or to conduct discovery addressed to the merits of class certification." *Frazier*, 430 Md. at 157.

CareFirst also argues that standing must be measured from the time the Skippers filed their action in state court, not from when they filed suit in federal court. Accordingly, since CareFirst made the $900 payment after the Skippers filed their federal complaint, and before they filed their state court action, CareFirst argues that this case is distinguishable from *Frazier*. However, if we were to accept that argument, it would allow insurers to pay off a class representative's relatively small claim in federal court, get that case dismissed on jurisdictional grounds, and then use the payoff made during the federal proceedings to get any subsequent state court actions dismissed for mootness, thereby denying the plaintiff any reasonable opportunity to seek class certification. Such a decision would mean that "many meritorious class actions will never get off the ground," exactly the outcome that the Supreme Court of Maryland sought to prevent with its decision in *Frazier*, 430 Md. at 157. Thus, the fact that the payment was made before the Skippers filed their state court action should not affect our application of *Frazier* to this case.

20

merits of the case because the plaintiff has been offered all that he can possibly recover through litigation.

653 F.3d at 1092 (citations omitted).

### D. There is No Alternative Ground Adequately Shown by the Record on which We Should Affirm

As an alternative argument, CareFirst contends that even if we find the Skippers have standing to pursue the relief they seek, we should still affirm the circuit court's dismissal because the Skippers failed to state a claim for breach of contract or negligent misrepresentation. Even though the circuit court's order was based solely on the Skippers' purported lack of standing, we "will affirm a circuit court's judgment on any ground adequately shown by the record, even one upon which the circuit court has not relied or one that the parties have not raised." *Monarc Const., Inc. v. Aris Corp.*, 188 Md. App. 377, 385 (2009) (quoting *Pope v. Board of Sch. Comm'rs*, 106 Md. App. 578, 591 (1995)). In other words, we may "affirm the trial court if it reached the right result for the wrong reasons." *Id.* Thus, we will affirm if the Skippers failed to state a claim for breach of contract or negligent misrepresentation.

The Skippers' breach of contract and negligent misrepresentation claims are based on a provision of their IEA with CareFirst which states, "Benefits for Medically Necessary, non-Experimental/Investigational artificial insemination, intrauterine insemination and in-vitro fertilization are covered." In their complaint, the Skippers alleged that "a frozen embryo transfer rather than fresh was medically necessary for the Skippers' fertility treatment" due to their physician's determination that pregnancy was "extremely unlikely to result from a fresh transfer." The Skippers also alleged that their situation is not unique,

21

considering that "in 2018, 74.3% of more than 107,000 embryo transfer cycles involved frozen embryo transfers."

CareFirst responded to the Skippers' complaint with a motion to dismiss, arguing that they failed to state a claim for breach of contract or negligent misrepresentation. While acknowledging that the IEA guarantees coverage for most components of IVF, CareFirst pointed to the IEA's exclusion of coverage for "Ovum transplants and gamete intra-fallopian tube transfer, zygote intra-fallopian transfer, or cryogenic or other preservation techniques used in these or similar procedures," and argued that IVF is "similar" to those three procedures. Although Maryland law requires CareFirst to cover infertility services like IVF, CareFirst argued that the exclusion of coverage for cryogenic or other preservation techniques is specifically allowed by law under COMAR 31.11.06.06(B)(11). Since the IEA specifically excluded coverage for cryogenic preservation techniques like embryo thawing, CareFirst contends that the Skippers failed to state a claim for breach of contract or negligent misrepresentation.

CareFirst is correct to point out that the IEA's exclusion of coverage for "cryogenic or other preservation techniques" is allowed by Maryland law. *See* COMAR 31.11.06.06(B)(11). However, this is not the end of our analysis. When reviewing the grant of a motion to dismiss, we must "assume the truth of, and view in a light most favorable to the nonmoving party, all well-pleaded facts and allegations contained in the complaint, as well as all inferences that may reasonably be drawn from them[.]" *Reiner*, 212 Md. App. at 151 (quoting *Gomez*, 427 Md. at 142).

The IEA excludes coverage for "Ovum transplants and gamete intra-fallopian tube transfer, zygote intra-fallopian transfer, or cryogenic or other preservation techniques used in *these or similar procedures*." Based on this language, coverage for the Skippers' embryo thawing should only be excluded if in-vitro fertilization is considered a "similar procedure" to ovum transplants, gamete intra-fallopian tube transfer, and zygote intra-fallopian transfer. CareFirst argued in its motion to dismiss that IVF is a "similar procedure," but the Skippers disputed that characterization in their response.

Whether in-vitro fertilization is similar to these other procedures is a question of fact, not a question of law that this Court can answer. Viewing the Skippers' well-pleaded facts and allegations in a light most favorable to them, IVF would not be considered similar to these other procedures, and the exclusion for cryogenic or other preservation techniques would not apply when those techniques are used in IVF.[11] And if the exclusion does not apply to IVF, then the court must resolve another question of fact: whether embryo thawing is a medically necessary component of IVF. Therefore, we will not hold as a matter of law that the Skippers failed to state a claim for breach of contract or negligent misrepresentation.

**JUDGMENT OF THE CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY IS REVERSED. CASE IS REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS ARE TO BE PAID BY APPELLEE.**

---

[11] The Skippers cited MIA Bulletin 13-01, which indicates that where, as here, health benefit plans are acquired in the individual market, the exclusion of coverage for cryogenic or other preservation techniques will not be permitted for IVF.

23